IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| RICK WEST, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No. 5:13-CV-338 (CAR) |
| HOUSTON COUNTY, GEORGIA, | : | |
| CULLEN TALTON, Individually and | : | |
| in his Official Capacity as Sheriff of | : | |
| Houston County, CHARLES HOLT, | : | |
| Individually and in his Official | : | |
| Capacity as Major in the Houston | : | |
| County Sheriff's Department, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## ORDER ON SUMMARY JUDGMENT

Plaintiff Rick West brings this employment discrimination action against his former employers, Houston County, Georgia and Sheriff Cullen Talton, and his former supervisor, Major Charles Holt, on the grounds that he was terminated on the basis of his race, in violation of 42 U.S.C. §§ 1981 and 1983 as well as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Currently before the Court is Defendants Houston County and Sheriff Talton's Motion for Summary Judgment [Doc. 32]. Having carefully considered the Motion, the response and replies thereto, and the applicable law, Defendants' Motion [Doc. 19] is **GRANTED** in part and **DENIED** in part.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[2]

When deciding a party's motion for summary judgment, the district court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party.  The court may not make credibility determinations or weigh the evidence.[3]  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[4]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[5]  If the non-moving party fails "to make a sufficient showing on an essential element of her case with respect to which she has the

---

[1] Fed. R. Civ. P. 56(a).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[3] *See id*. at 254-55; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

[4] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

[5] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.

burden of proof,"[6] the motion for summary judgment must be granted.

For the purposes of this motion, the relevant facts are taken principally from the parties' statement of material facts and responses thereto [Docs. 32-2, 51-1, 51-2, & 52-1]. Under Rule 56, the district court need only consider the materials cited by the parties, though it may also consider other materials in the record. Fed. R. Civ. P. 56(c). The court is not expected to scour the depositions, declarations, and exhibits to identify evidence that could create a genuine issue of material fact or establish the lack of.[7] It is the parties' burden to identify specific evidence in the record and to articulate the precise manner in which that evidence supports their position on summary judgment.[8]

## BACKGROUND

The facts, construed in the light most favorable to Plaintiff, the non-movant, are as follows:

In 1997, Plaintiff Rick West, an African American male, began working for the Houston County Sheriff's Department ("HCSD") as a detention officer. At the time of his termination fifteen years later, he was ranked as Sergeant and served as a supervisor in the inmate intake area at the Houston County Detention Center ("the Jail").[9] During

---

[6] *Celotex*, 477 U.S. at 323.

[7] *See e.g., Tomasini v. Mount Sinai Medical Center of Florida, Inc.,* 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla., 2004) (citing *L.S. Heath & Son, Inc. v. AT & T Info. Sys. Inc.,* 9 F.3d 561, 567 (7th Cir. 1993)); *Compania de Elaborados de Café v. Cardinal Capital Mgmt., Inc.,* 401 F. Supp. 2d 1270, 1282 n.5 (S.D. Fla.2003).

[8] *See id; Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir. 1992)).

[9] Plaintiff's Response to Defendants' Statement of Facts ("Pl.'s Resp. Defs.' SF") [Doc. 51-1] ¶¶ 23-25

his tenure, Plaintiff received "fully satisfactory" or "superior" performance reviews.[10]

On the evening of July 24, 2010, Plaintiff went to Seanna's Lucky Cabin ("the Lucky Cabin"), an illegal video gambling establishment in Warner Robins, Georgia, to pick up his girlfriend, Valerie Brown.  At the time, Plaintiff was off-duty and not in uniform.  He drove to Lucky Cabin after a telephone call with his girlfriend during which they argued over the fact she was gambling.  Plaintiff did not want Brown to be at the Lucky Cabin because he knew the establishment was operating illegally.[11]

When Plaintiff arrived at the Lucky Cabin, he recognized the man who let him inside as Phil Campbell, a former inmate at the Jail.  Campbell had numerous prior arrests and convictions.[12]  The parties dispute what happened thereafter:  Plaintiff states that, when he arrived, he found Ms. Brown, tapped her on the shoulder, said "let's go," and escorted her out.  Plaintiff did not push his girlfriend or curse at her.[13]  The owner of the establishment, Seanna Milam, walked out behind Plaintiff screaming and cursing.[14]  Campbell also followed them.  As Campbell made his way to the door, Plaintiff pointed in his direction, told them that he knew the establishment was

---

[10] Plaintiff's Statement of Material Facts ("Pl.'s SF") [Doc. 51-2]  ¶ 1
[11] *Id*. at ¶¶ 123-126; Defendants' Statement of Undisputed Facts ("Defs.' SF") [Doc. 32-2] ¶¶ 62-63, 64, 66.
[12] *Id*. at ¶ 126
[13] *Id*. at ¶¶ 127-128
[14] *Id*. at ¶¶ 130-132

operating illegally, and threatened "to help [his] boys shut [the] place down."[15] Campbell and Milam knew that Plaintiff worked for the HCSD.

After the incident, Plaintiff phoned the HCSD, spoke to Sergeant Guy Fussell, and reported that illegal gambling was taking place at the Lucky Cabin.  The same night, Sergeant Fussell also received a message from Seanna Milam; she had called the HCSD and requested a phone call from an officer.  When Sergeant Fussell returned her call, Milam did not request assistance at the Lucky Cabin; she only wanted to report Plaintiff's appearance there.  Because the Lucky Cabin was located inside the city limits, Fussell referred the matter to the Warner Robins Police Department ("WRPD").[16]

An officer with the WRPD was dispatched and met with Milam that evening. According to his incident report, Milam alleged that, when Plaintiff arrived, he "snatched [Brown] out of her chair and pushed her out the front door."  Milam stated that, as Campbell made his way to the door, Plaintiff put his hand on Campbell's forehead and pushed him back inside. Neither Plaintiff nor Brown was interviewed by the WRPD, and thus the incident report does include their side of the story.[17]  In a sworn declaration, Brown later stated that she left voluntarily and that Campbell's story was false.  The WRPD did not pursue the matter; and Plaintiff was never arrested.[18]

---

[15] Pl.'s Resp. Defs.' SF ¶¶ 71, 73, 74
[16] Pl.'s SF 136-138, 140, 141-142;
[17] Talton Dep., Ex. 14
[18] Pl.'s SF ¶¶ 129, 143, 146

Although Plaintiff was never arrested, a copy of the incident report was forwarded to the HCSD.  After learning of the incident, Major Holt called Milam and spoke with her several times about what happened; he also obtained statements from Campbell and another witness.[19]   At that time, Holt was aware that Milam was the owner of an illegal casino and that Campbell was a former inmate at the Jail. He also presumed that their witness was either one of Milam's employees or someone who was gambling illegally at the Lucky Cabin.[20]

Major Holt did not question Plaintiff about the incident.  Nor did he speak to Ms. Brown to find out whether she supported Milam's story.  If he had, Major Holt may have learned that Ms. Brown left with Plaintiff voluntarily.  She has since stated that Plaintiff did not hurt her and that Plaintiff did not put his hand on Campbell.[21]   Holt, however, simply took the word of persons involved in an illegal gambling enterprise and a former HCSD inmate who knew Plaintiff worked at the Jail.  It was not unusual for inmates to make false charges against officers, and Holt admitted that it was not his usual practice to take the word of an inmate over the word of an officer.[22]

---

[19] *Id*. at ¶ 155; Pl.'s Resp. Defs.' SF ¶¶ 79; Holt Dep. 128:6-8, 129:10-25
[20] *See* Pl.'s SF ¶ 165-166
[21] *Id*. at ¶ 129, 162-163, 165
[22] *Id*. at ¶ 165-167, *See* Holt Dep. 138:20-23, 278-1-13, 280:1-10.

On Wednesday, July 28, 2010, Major Holt drafted a written recommendation for Plaintiff's termination.[23]  Though Holt had the authority to issue or recommend a lessor sanction, such as a suspension or demotion, he did not choose to take lessor action.  In the memo to his superiors, Holt stated that he instead recommended termination because he believed Plaintiff lacked self-control and was a proven threat to his girlfriend, coworkers, inmates at the Jail, and members of the community.[24]  In support, Major Holt cited the Lucky Cabin incident and three former allegations of misconduct:

> (1) Holt first referenced an incident involving the use of force on an inmate, Benjamin McLemore.[25]  The recommendation, however, failed to disclose that the inmate was injured after he grabbed Plaintiff and Plaintiff used a defensive tactic of striking him with an open hand, which is permissible in that situation.  Here, it caused the inmate to fall and break his ankle; the hit also left hand mark.  Plaintiff was later accused of using excessive force, but Holt never interviewed or questioned him about the incident.[26]

> (2) Holt also cited an incident when Plaintiff argued with a subordinate white male, Daryl Foster.[27]  Major Holt failed to disclose, however, that there was a dispute as to what caused the altercation and what was said.

---

[23] Pl.'s SF ¶ 157

[24] *Id*. at ¶¶ 160, 162, 164; Holt Dep. Ex. 24

[25] West Dep. Ex. 4, Pl.'s SF ¶ 24

[26] Pl.'s SF ¶¶ 23, 25-28, 30, 32-33

[27] West Dep, Ex. 4, Pl.'s SF ¶ 22

Plaintiff claims that Foster, a lower ranking officer, provoked him by intentionally and repeatedly calling him the wrong name.[28]  Plaintiff felt that Foster was being insubordinate, but did not write him up because every time Foster was accused of insubordination, "Holt did nothing about it."[29]  So Plaintiff just got over it, and Holt never questioned him about anything he said to Foster.[30]

(3) Holt then described two incidents when inmates were able to smuggle contraband into the jail—one hid money in a cast on his arm and another consumed drugs.[31]  Major Holt later admitted that Plaintiff was not responsible for searching the inmate's cast, and the inmate who consumed drugs did so before he was inside the intake area.[32]

Also included with Holt's recommendation were the WRPD report and statements from witnesses who worked for in Milam at the Lucky Cabin.  There was no statement from Plaintiff or his girlfriend.  No one at the HCSD ever asked Plaintiff about the incident.[33]

Major Holt submitted the recommendation to his superiors, Chief Deputy Rape[34]

---

[28] Pl.'s SF ¶¶ 14-28
[29] Foster Dep. 108:8-16.  Foster was reported by another supervisor for being rude and insubordinate on multiple occasions; however, Holt never took any disciplinary action against Foster.  Pl.'s SF ¶¶ 43-49
[30] Pl.'s SF ¶¶ 18, 20-21
[31] West Dep. Ex. 4
[32] Pl.'s SF ¶¶ 168-169, 173-174
[33] Pl.'s SF ¶ 156
[34] Id. at ¶ 158-159

and Sheriff Talton.[35]   Sheriff Talton served as the ultimate and final authority for personnel decisions at the HCSD,[36] but he delegated full responsibility over the jail to Major Holt.[37]   Thus, with respect to disciplinary matters at the jail, Major Holt had the discretion and authority to issue written and verbal reprimands to jail employees, which were not appealable.   Holt also had the authority to suspend personnel under his command for three days without appeal or for five days with the right to an appeal.   A longer suspension, demotion, or termination required the Sheriff's approval.[38]

The usual practice was for the necessary paper work to first go to the HCSD administrator, Colonel McGhee.   He would review it, and if he concurred with the recommendation, it was sent on to Chief Deputy Rape.   Rape would then review the paperwork, and if he also signed off on it, the recommendation would be considered by the Sheriff.[39]   Talton would always talk to Rape before terminating an employee.[40]

In this case, the usual administrative process was not followed; Major Holt sent his recommendation directly to Chief Deputy Rape.[41]   After reviewing only Holt's

---

[35] *Id*. at ¶¶ 147, 149; Rape Dep. 17:20-23
[36] Pl.'s Resp. to Defs.' SF ¶¶ 1, 9
[37] *Id*. at SF ¶¶ 2, 5
[38]  *Id*. at ¶¶ 14-15, 19-22
[39] McGhee Dep. 11:5-23
[40] Pl.'s SF ¶ 150; Talton Dep. 25:22-26:13.
[41] In his deposition, Colonel McGhee stated did not receive or review any paperwork regarding Plaintiff's termination and had nothing to do with that decision.  McGhee Dep. 12:6-14:11.  There is some a dispute on this point. Chief Deputy Rape stated that he gave the paperwork to McGhee to review and that McGhee signed off on it and returned it to him.  Rape Dep. 161:19-163:14.  McGhee failed to remember whether he actually discussed the incident with Rape and Talton, but he stated that no one ever asked

recommendation and attachments, Rape notified Plaintiff that he was on "suspension without pay pending termination" because he engaged in "conduct unbecoming an officer," in violation of the HCSD's Standard Operating Procedures.[42]   Rape's subsequent report to the Georgia Department of Labor, specifying the reason for Plaintiff's termination, stated that Plaintiff had "caused public respect for the [HCSD] to be destroyed."[43]   Rape believes that any time an HCSD officer is involved in "any kind of fracas" off duty "it brings down public respect for the department."[44]

When he issued the suspension, Chief Deputy Rape had not interviewed Plaintiff or any other witnesses, asked anyone else to get a statement from Plaintiff, or done any independent investigation into the matter; and he had no knowledge of whether Major Holt had ever questioned Plaintiff.  Rape simply took Holt's facts at face value.[45]

Chief Deputy Rape was aware, when he read the recommendation, that Plaintiff had been arrested years earlier in Dooly County, on questionable charges, and that those charges were in fact dropped shortly thereafter.[46]   In his deposition, however,

---

him if he thought Plaintiff should be terminated.  McGhee Dep. 12:6-14:11, 20:5-23:4.   Therefore, because all facts must now be viewed in Plaintiff favor, the Court will proceed, for the purpose of this Motion, as if McGhee was not involved in Talton's decision to terminate Plaintiff.

[42] See Rape Dep., Ex. 12 [Doc. 45].

[43] Pl.'s Resp. to Defs.' SF ¶ 84

[44] Pl.'s SF ¶ 52

[45] Id. at ¶ 177-183; Rape Dep. 97:17-98:14

[46] Rape Dep. 93:5-12, 108:1-1-4; See Pl.'s SF ¶ 3.  Plaintiff was arrested while moonlighting as a bouncer at a bar in Dooly County because it appeared as if he was impersonating a deputy sheriff.  The main issue was that Plaintiff wore generic shirt with the word "Sheriff" across the front.  Id. at 117-119:6.  Rape

Rape stated that neither the Dooly County incident nor the misconduct listed in Holt's recommendation[47] were factors in his decision to suspend Plaintiff pending termination.[48]  Rape also testified that Plaintiff would not have been terminated, but for Holt's recommendation;[49] and he could not remember a time when he rejected a recommendation after receiving it and any further review from Holt.[50]

The suspension letter also notified Plaintiff that he had the right to appeal the termination decision.[51]  Plaintiff chose to exercise that right, and was allowed an appeal hearing.[52]  Rape only attended the beginning of the hearing and supplied the hearing officer with Major Holt's findings.[53]  Rape did not hear any testimony or evidence.[54]

Afterward, the hearing officer issued a letter upholding Plaintiff's termination. Sheriff Talton did not attend or participate in the hearing or hear any report about what happened at the hearing.[55]  Neither Rape nor Talton consulted with the hearing officer,

---

admits to questioning the correctness of the arrest when it occurred, and he believed Plaintiff should not have been arrested.  *Id*. at 11:2-23, 109:2-11, 184:16-15.

[47] Rape Dep. 91:10-21, 129:20-23, 184:1-7; Pl.'s SF ¶ 184-185.  One other incident involving Plaintiff's use of a taser was raised by Defendants as cause for his termination, although it was not included in Holt's recommendation.  Holt only raised the issue after he learned that Plaintiff planned to file an EEOC charge. Pl.'s SF ¶¶ 34-37, Holt Dep. 166:23-167:7.  Rape said he did not know about the incident, and it was not a factor in his decision.

[48] Rape Dep. 129:20-23.

[49] *Id*. 132:13-133:4.  Rape stated that, if Holt had recommended some lessor action, such as a demotion or suspension, he would have considered it; Rape just went along with Holt's recommendation.  *Id.*

[50] Rape Dep. 31:10-15

[51] Holt Dep. 21:15-23:13, Ex. 1

[52] Pl.'s Resp. to Defs.' SF ¶ 83

[53] Rape Dep. 115:15-116:7

[54] *Id*. at 117:25-118:21, 120:13-15

[55] Pl.'s SF ¶ 190; Talton Dep. 78:13-20, 94:1-6; Holt Dep. 148:8-10

11

and neither read a transcript of the hearing before Plaintiff's termination.[56]  Talton also did not request to review any materials from at the hearing; the only thing he received was a letter stating that the termination was upheld.[57]

Sheriff Talton likewise did not review Holt's recommendation or speak to Holt about the facts of the case before terminating Plaintiff.[58]  Talton never independently investigated the allegations, spoke to Plaintiff, or inquired as to whether anyone else had spoken to Plaintiff or his girlfriend[59]; he never reviewed witness statements[60]; and he never read the narrative section of the incident report.[61]  As a result, Talton did not know about the excessive force allegation or that Plaintiff may have referenced his connection to the HCSD at the Lucky Cabin; so those things were not factors in his decision.[62]  Sheriff Talton additionally stated that no one had ever told him Plaintiff's job performance was unsatisfactory prior to his termination.[63]  Although, like Rape, Talton was aware of his Dooly County arrest when Plaintiff was terminated, Talton stated that he was "fine" with Plaintiff continuing to work for the HCSD in spite of that incident.  Plaintiff was actually given raise shortly thereafter.[64]

---

[56] Rape Dep. 120:1-121:5, Talton Dep. I 97:3-12

[57] Talton Dep. 97:3-12

[58] Talton Dep. 68:10-69:9, 75:10-13

[59] Pl.'s SF ¶¶ 194, 197, 199-201; Talton Dep. 69:22-25, 70:4-7, 71:10-13, 108:25-109:2

[60] Pl.'s SF ¶ 198; Talton Dep. 70:1-3

[61] Pl.'s SF ¶ 204

[62] Id. at ¶¶ 193, 195-196; Talton Dep. I 64:6-65:13, 81:16-19

[63] Talton's Dep. 58:21-24.

[64]  Pl.'s SF ¶ 13; Pl.'s Resp. to Defs.' SF ¶ 81; Talton Dep. 119:1-5

The HCSD's hearing officers nearly always adopted recommendations when appealed; and, though Sheriff Talton is not required to adopt the appeal decisions, he "never had an occasion where [he] didn't follow the decision of a hearing officer."[65] Even when the hearing officer made decisions that Talton did not completely agree with, he would go along with what the hearing officer decided.[66] It further appears that neither the hearing officer nor Talton had ever declined to adopt one of Major Holt's recommendations to discharge an employee: During the time Holt as served as Major, he recommended the termination of a dozen or more employees, and all were terminated.[67] The hearing officer and Talton approved Holt's recommendation to terminate Plaintiff's employment in this case as well.[68] Talton would not have terminated Plaintiff if Holt had not recommended that he do so.[69]

Neither Chief Deputy Rape nor Sheriff Talton admits to being aware of any racial bias harbored by Major Holt.[70] Yet, there were other employees who had filed charges of discrimination against Holt.[71] Major Holt admitted that he had called someone a "nigger" in the past.[72] There is evidence that, on one occasion, Holt asked a white female officer if she was "sleeping with that nigger" (referring to an African-American

---

[65] Pl.'s SF ¶¶ 191-192; Rape Dep. 121:15-17, 123:24-124:13; Talton Dep. I 92:1-5, 94:7-18, 96:19-24
[66] Talton Dep. 94:10-14.
[67] Pl.'s SF ¶¶ 152-153; Holt Dep. 58:18-59:5; Talton Dep. 17:5-10
[68] Pl.'s SF ¶ 205; Holt Dep. 150:1-9
[69] Pl.'s SF ¶ 189; Talton Dep. 62:20-25, 109:11-14
[70] Rape Dep. 140:20-141:5; Talton Dep. 112:1-12
[71] Pl.'s SF ¶¶ 84-86
[72] Pl.'s SF ¶ 100

supervisor).[73]  Holt likewise told another white female officer that, as long as she was dating Plaintiff, she would not be promoted.[74]

Major Holt also admitted to viewing racist websites and discussion forums.  Holt used his HCSD computer and email account to forward a link for the website www.niggermania.net to his personal account and looked at both that web page and www.niggermania.com when he got home. "Niggermania" is a website "dedicated to spreading the truth and presenting facts about niggers," and has "many pages of nigger jokes and racist humor."  Holt looked through the website and some of its forums.  He also, on numerous occasions, viewed a website entitled "Stuff Black People Don't Like," which similarly disparages African Americans.[75]

After his termination, Plaintiff filed a charge of discrimination, and the EEOC found reasonable cause to believe that Plaintiff was subjected to race discrimination.[76]

## DISCUSSION

Based on the foregoing, Plaintiff brought the present action asserting that Houston County, Sheriff Talton, and Major Holt discriminated against Plaintiff on the basis of his race in violation 42 U.S.C. § 1981 and § 1983.  Plaintiff also brings claims against Houston County and Sheriff Talton under Title VII.  Presently before the Court

---

[73] Thompson Dep. 24:1-8; Mitchell Dep. 6-8.
[74] Thompson Dep. 20:24-25
[75] *See* Pl.'s SF ¶¶ 99, 102-121
[76] *Id*. at ¶ 122

is Houston County and Sheriff Talton's Motion for Summary Judgment.

## I. Claims against Houston County

Defendants first argue that Plaintiff's claims against Houston County fail as a matter of law because Sheriff Talton is not considered an employee of the County.[77] Plaintiff does not dispute that Houston County should be dismissed and admits that the proper defendant is the HCSD or Sheriff Talton in his official capacity.[78]

Accordingly, with respect to all claims against Defendant Houston County, Defendants' Motion for Summary Judgment is **GRANTED**.

## II. Claims against Sheriff Talton

As to the remaining claims, Sheriff Talton argues (1) that there is not sufficient evidence for a jury to find that race was a motivating factor in Plaintiff's termination and (2) that he is entitled to qualified immunity as to the §§ 1981 and 1983 claims against him in his individual capacity and sovereign immunity as to those claims brought against him in his official capacity.

### A. Evidence of Intentional Discrimination

The test and evidentiary burdens for establishing claims of intentional

---

[77] Under Georgia law, a sheriff has the authority to hire and fire employees, direct and regulate their duties, and control their daily activities, including the power in this discretion to appoint deputies. O.C.G.A. § 15-16-23.   A county is precluded from controlling or affecting the sheriff's office or personnel. *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1333 (11th Cir. 2003).   Therefore, as a matter of law, a sheriff is "independent of the county and its governing body." *Martin v. Peach Cnty., Ga.*, 5:10-cv-236, 2001 WL 4830176, at * 6 (M.D. Ga. Oct. 12, 2011).
[78] *See* Plaintiff's Response [Doc. 51] at 27 n.7.

15

discrimination under the Title VII, § 1981, and § 1983 are essentially the same.[79]   All employ the *McDonald Douglas*[80] framework:  First, the plaintiff must identify sufficient evidence to establish a *prima facie* case of discrimination.[81]   If the plaintiff does so, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the decision.[82]   If the employer meets this burden, the plaintiff then has an opportunity to show that the employer's proffered reasons for the adverse employment action are pretext for discrimination.[83]   The intermediate burdens of production shift, but "the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff."[84]

      1.   Prima Facie Case

The first issue therefore is whether Plaintiff has identified sufficient evidence on summary judgment to establish a *prima facie* case of discrimination.   Because it is undisputed that this is not a case involving direct evidence discrimination, Plaintiff will have to establish his case with circumstantial evidence.   The most common way to do so is for the plaintiff to show: (1) he is a member of a protected class; (2) he was qualified

---

[79] *See Patterson v. McLean Credit Union*, 491 U.S. 164, 185–87 (1989) (finding that the *McDonnell Douglas* framework for proving intentional race discrimination is applicable to § 1981 claims); *Cross v. Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995) (holding that where § 1983 is used as a parallel remedy for a violation of Title VII, the elements of the causes of action are the same.).

[80] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

[81] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[82] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

[83] *Id.* at 253.

[84] *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002)

for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class <u>or</u> was treated less favorably than a similarly-situated individual outside his protected class.[85]   If a plaintiff is unable to satisfy the fourth prong of this test, a *prima facie* case may, in the alternative, be proven by "a convincing mosaic of circumstantial evidence sufficient for a jury to reasonably infer intentional discrimination."[86]

In this case, Talton does not dispute whether Plaintiff can satisfy the first three elements of a *prima facie* case.   He contends that Plaintiff's claims fail, as matter of law, because: (1) Plaintiff's proffered comparators are not sufficiently similar[87]; (2) Plaintiff's evidence is not sufficient for a jury to otherwise infer intentional discrimination; and (3) even if there is sufficient evidence that race was a motivating factor in Holt's recommendation, any discriminatory intent by Holt cannot be not imputed to Talton.

### a.   Similarly Situated Comparators

To determine other whether employees are "similarly situated" in the context of a disciplinary action, the court must consider whether the employees were accused of the same or similar misconduct and disciplined in different ways.[88]   The plaintiff is thus required to identify at least one similarly situated employee, outside his protected class,

---

[85] *See McDonnell Douglas,* 411 U.S. at 802.

[86] *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011) (emphasis added).

[87] It is undisputed that Plaintiff was not replaced by a person outside his protected class.  Defs' SF ¶ 86-87.

[88] *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.) (quoting *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997)), opinion modified by 151 F.3d 1321 (11th Cir. 1998).

who engaged in nearly identical misconduct, but received more favorable treatment.[89]
When comparing misconduct, "the quantity and quality of the comparator's misconduct
must be nearly identical to prevent courts from second-guessing employers' reasonable
decisions and confusing apples with oranges."[90]  The most important factor, however, is
"the nature of the offenses committed" not the exact facts of the each case.  "Exact
correlation is neither likely nor necessary"; the cases need only "be fair congeners."[91]
"In other words, apples should be compared to apples."[92]

In this case, Sheriff Talton contends that Plaintiff must identify an employee
outside his protected class who both (1) engaged in an unlawful public altercation *and*
(2) directly implicated the HCSD in his misconduct.[93]   These, however, were not
necessarily the factors considered at the time of Plaintiff's termination.  Sheriff Talton
never claimed that Plaintiff was terminated because he directly implicated the HCSD in
the Lucky Cabin incident.   Talton did even not know that Plaintiff referenced his
connection to the HCSD during the Lucky Cabin incident; it was thus not a factor in his

---

[89] *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999).

[90] *Id.*

[91] *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989)

[92] *Id.*

[93] Defendants do not contend on summary judgment that the comparators are dissimilar when quantity of past misconduct is considered, and it is unclear whether there is evidence to support that argument. The Court will thus not make that argument *sua sponte*.  There is "no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Furthermore, the evidence shows that Plaintiff was not ever questioned or disciplined with respect to much of the misconduct alleged. *See infra.*

decision.[94]   Plaintiff was also never informed that he was terminated for engaging in unlawful conduct and implicating the HCSD.   Rape's termination letter stated that Plaintiff had engaged in "conduct unbecoming an officer."   In a later report, Rape stated that Plaintiff "caused public respect for the [HCSD]" to be destroyed,[95] which he believes occurs anytime an HCSD officer is involved in "any kind of fracas" off duty. The Court thus finds Sheriff Talton's comparator requirements to be overly narrow.

Plaintiff, on the other hand, identifies an overly broad category of comparators. He contends that he need only identify another officer who engaged in "conduct unbecoming an officer."   The HCSD defines conduct unbecoming an officer as the "commission of a felony, misdemeanor, or violation of a county ordinance; habitual indulgence in narcotics or drugs; disobedience of or failure to comply with orders, or immorality."[96]   This definition encompasses many different types of misconduct in both action and severity.   An employee fired after committing a criminal battery cannot be reasonably compared to one involved in non-physical or administrative misconduct.[97]

That being said, Plaintiff has identified HCSD officers, outside his protected class, who were not terminated after being accused of serious misconduct, certainly no

---

[94] Pl.'s SF ¶¶ 193, 195-196, Talton Dep. I 64:6-65:13, 81:16-19

[95] Pl.'s Resp. to Defs.' SF ¶ 84; Pl.'s SF ¶ 52

[96] Holt Dep. 21:15-23:13, Ex. 1

[97] *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1260 (11th Cir. 2001) (misconduct of a violent nature is not comparable to receiving a DUI); *Floyd v. Federal Express Corp.*, 423 F. App'x 924 (11th Cir. 2011) (non-physical conduct cannot be considered nearly identical to battery).   *See also, Hawkins v. Ceco Corp.*, 883 F.2d 977, 985 (11th Cir. 1989), cert. denied, 495 U.S. 935, 1467 (1990) (stealing and insubordination are not comparable misconduct).

less serious than Plaintiff's conduct at the Lucky Cabin.[98]  The seriousness of the offense is of course not solely determinative; the misconduct must also be similar in form.[99] With that in mind, the Court finds that a proper comparator is another HCSD officer who was accused of misconduct involving (1) an assault, battery, or similar disturbance while off duty which was (2) sufficiently serious to also involve a police report, arrest, or other public recognition which may reflect poorly on the HCSD.   Under this standard, Plaintiff has identified at least one similarly situated officer outside his protected class who received more favorable treatment during the investigation of charges of misconduct and received lesser or no disciplinary sanction.

Daryl Foster, a white HCSD detention officer, was arrested after being involved in a bar fight.  Despite Foster's actual arrest for disorderly conduct, Major Holt did not recommend Mr. Foster's suspension or termination.[100]   Nor did Holt initiate his own investigation into the incident, read the arrest report, or interview the other individual involved.[101]   Major Holt instead spoke only with Foster and believed his side of the story, which was that he was an innocent bystander and victim of attack, not the aggressor.  The charges against Foster were later dropped, as they were in Plaintiff's

---

[98]  *See Lobeck v. City of Riviera Beach*, 976 F. Supp. 1460, 1467 (S.D. Fla. 1997).  "Of course, trial may prove that these incidents were in fact very different from the incidents that Plaintiff's demotion, but the Court is reluctant to usurp the function of the jury" on this issue.  *Id.*
[99]  *Accord Bethel v. Porterfield*, 293 F. Supp. 2d 1307, 1321 (S.D. Ga. 2003), aff'd, 116 F. App'x 246 (11th Cir. 2004) (unpublished table decision).
[100]  Pl.'s SF ¶¶ 50-51; Holt Dep. Ex. 7
[101]  *Id.* ¶ 54

case.  Yet, unlike Plaintiff – who was immediately suspended and then terminated after the Lucky Cabin incident without ever being questioned – Foster received *no* disciplinary action despite the fact that he too was involved in a public fracas, initially suspected of battery, *and* actually arrested.

Plaintiff also identifies Sean Alexander, a white male, who was arrested for "sexual battery" in 2009.[102]  Major Holt did not recommend Alexander's termination as a result of the charge.  Unlike in Plaintiff's case, Major Holt *and* Sheriff Talton both chose to talk to Alexander first because, as Talton explained, there are "two sides to every story."  They did not consider or ask for a statement from Alexander's accuser[103]; Sheriff Talton instead interviewed Alexander personally and got a written statement from him.  Talton believed that "it was important to get Alexander's side of the story before making any decision."[104]  In the end, despite his actual arrest and criminal charges being filed against him, Alexander was not terminated because he, like Plaintiff, "was not proven guilty" of the crime alleged.  Alexander remained employed by the HCSD for a number of years until he resigned voluntarily. [105]

Based on these comparators, the Court finds that Plaintiff has sufficiently satisfied the fourth element of the traditional test and established a *prima facie* case of

---

[102] *Id*. ¶ 69; Holt Dep. Ex 9.
[103] Talton Dep. 47:6:15
[104] Pl.'s SF ¶ 72-74
[105] *Id*. at ¶ 71, 75

intentional discrimination. The Court thus need not consider Plaintiff's "convincing mosaic" argument on summary judgment.

####   b.   *Cat's Paw Theory of Liability*

The Court also finds that Plaintiff's evidence is sufficient to create a triable issue as to Talton's liability under a "cat's paw" theory.  To proceed under this theory, a plaintiff must identify evidence that the ultimate decision-maker followed a discriminatory recommendation of a subordinate without "independently investigating" the basis for termination.[106]  If, however, the evidence shows that the decision-maker conducted his own evaluation of the misconduct and makes an independent decision, his decision is "free of the taint of a biased subordinate employee."[107]  Still, vague evidence of an "independent investigation" standing alone does not preclude liability:  If the plaintiff can show that "the independent investigation relied on facts provided by the biased supervisor," a jury could find that "the investigation was not, in actuality, independent."[108]  Therefore, in this case, to proceed under a cat's paw theory, Plaintiff must present evidence: that Major Holt's recommendation was motivated by a discriminatory animus; that he intended the

---

[106] *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).

[107] *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001).

[108] *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352 (6th Cir. 2012).  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) (noting that it "is necessary in any case of cat's-paw liability" that "the independent investigation rel[y] on facts provided by the biased supervisor").

recommendation to result in Plaintiff's termination; and that his recommendation was the proximate cause of Plaintiff termination.[109]

Based on the comparators identified above, the Court finds that Plaintiff has identified sufficient evidence to establish a *prima face* case of intentional discrimination against Major Holt. Plaintiff has also identified ample evidence in this case that neither Chief Deputy Rape nor Sheriff Talton conducted any type of investigation into the factual basis for Holt's recommendation and simply took Holt's one-sided findings at face value. In so doing, both effectively delegated the fact-finding portion of the investigation to Major Holt, who in turn gave his superiors selective information about Plaintiff's misconduct. Rape and Talton further concede that they would not have, absent Holt's recommendation, terminated Plaintiff. This is certainly evidence of proximate causation.[110]

Defendants argue that Plaintiff's appeal hearing before an independent hearing officer still breaks the causal connection between any racial animus harbored by Major Holt and Sheriff Talton's choice to terminate Plaintiff. The evidence does show that Plaintiff was permitted an appeal hearing. Yet, the hearing officer was also given Holt's

---

[109] *See Staub*, 562 U.S. at 422. *See also King v. Volunteers of Am., N. Ala., Inc.*, 502 F. App'x 823, 828 (11th Cir. 2012) (applying principles of *Staub* to Title VII case).

[110] *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 353 (6th Cir. 2012) (investigation conducted was not "unrelated" to bias actions when non-decisionmaker both misinformed and selectively informed the employer about the incident; reasonable factfinder could find non-decisionmaker's actions were a proximate cause of the adverse decisions). *Accord Watkins v. EFP, LLC*, No. 5:12-CV-02747-JHE, 2014 WL 7337392, at *18 (N.D. Ala. Dec. 23, 2014) (finding that plaintiff produced sufficient evidence of proximate cause where decisionmaker relied entirely on biased supervisor's fact-finding).

findings to consider,[111] and Defendants have not identified evidence to show how or why the hearing officer decided to uphold the termination, what evidence was presented during the hearing, or if Plaintiff was permitted to call or cross-examine any witnesses.  Rape and Talton never heard any of the testimony; nor did Talton inquire about the evidence presented at the hearing before terminating Plaintiff.

In the absence of any evidence to show that Plaintiff's termination was independently investigated apart from those findings included in Holt's recommendation, Plaintiff's evidence is sufficient to at least create a jury question as to the extent of Sheriff's Talton's liability.  The Third Circuit Court of Appeals in fact upheld the application of the cat's paw theory in an analogous situation where, as here, it was not clear whether the plaintiff called witnesses on his behalf or cross-examined his supervisor; there was no evidence about testimony at the hearing; and there was no evidence that the decisionmaker reviewed hearing materials prior to the termination.[112]

Furthermore, even if the Court were to assume that Plaintiff did have some opportunity to present a defense at the hearing, he has also identified sufficient evidence that the hearing itself may have been one in a series of "rubber stamps" leading to his termination and not a true break in the causal link.  The evidence, when

---

[111] Defs' SF ¶ 84.

[112] *See McKenna v. City of Philadelphia*, 649 F.3d 171, 178-79 (3d Cir. 2011).  *Compare with Stimpson*, 186 F.3d at 1332 (finding that decisionmaker was not liable under cat's paw theory where plaintiff was provided a hearing, with counsel, and allowed to put on defense evidence and witnesses).

viewed in Plaintiff's favor, shows that Chief Deputy Rape simply adopted Holt's recommendation without investigation and provided it for the hearing officer to consider, that the hearing officer had never disagreed with a termination recommended by Major Holt,[113] and that Sheriff Talton always followed the decision of the hearing officer and did not, in this case, conduct any independent investigation of his own.[114]

Thus, while Sheriff Talton claims that he relied on the decision of an independent hearing officer when terminating Plaintiff, the Court finds that material issues of fact exist as to whether Sheriff Talton's decision was based on any information independent of those facts presented by Major Holt.  For this reason - and because there is sufficient evidence that Holt harbored a discriminatory animus and intended to cause Plaintiff's termination – the Court finds Plaintiff has also established a *prima facie* case against Talton under a cat's paw theory.[115]

## 2. Legitimate, Nondiscriminatory Reason Plaintiff's Termination

Because Plaintiff can establish a *prima facie* case of discrimination, "a legal presumption of unlawful discrimination arises and the burden shifts to [Sheriff Talton]

---

[113] Again, during the time Holt as served as Major, he recommended the termination of a dozen or more employees, all of which were terminated.  Talton could not remember declining to terminate someone that Holt recommended for termination.  Pl.'s SF ¶¶ 152-153, 191-192; Rape Dep. 121:15-17, 123:24-124:13; Talton Dep. 17:5-10, 92:1-5, 94:7-18, 96:19-24.

[114] Pl.'s SF ¶¶ 191-192; Rape Dep. 121:15-17, 123:24-124:13; Talton Dep. I 92:1-5, 94:7-18, 96:19-24

[115] *See also Dwyer v. Ethan Allen Retail, Inc.*, 528 F. Supp. 2d 1297, 1304 (S.D. Fla. 2007) aff'd, 325 F. App'x 755 (11th Cir. 2009) (finding that plaintiff provided sufficient evidence that non-decisionmaker harbored a discriminatory animus and then passed information to the decisionmaker which caused Plaintiff to be terminated – and thereby demonstrated a *prima facie* case of discrimination under a "cat's paw" theory).

to articulate a legitimate, nondiscriminatory reason for the challenged employment action."[116] This burden is "exceedingly light": It is one of production rather than persuasion.[117] Talton need only offer "a clear and reasonably specific non-discriminatory basis" for his decision.[118]

Here, Sheriff Talton now claims that Plaintiff's termination was based, in part, on his prior incidents of misconduct - including the Dooly County arrest years earlier and those incidents included in Holt's recommendation – i.e., Plaintiff's use of force on an inmate, the dispute with his subordinate Daryl Foster, and his subordinate's failure to discover contraband on inmates during intake.  He also refers to another incident when Plaintiff was suspected of having unnecessarily deployed his taser.  Sheriff Talton thus now contends that, while it was the Lucky Cabin incident that actually precipitated Plaintiff's termination, that incident - when coupled with the identified prior misconduct - provides a legitimate, nondiscriminatory reason for his termination.[119]  In so doing, Sheriff Talton has satisfied his burden of production.

       3.  <u>Pretext</u>

Accordingly, Plaintiff's case now turns on his evidence of pretext.  A plaintiff may make a showing of pretext "by either directly persuading the Court that a

---

[116] *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir. 1997).

[117] *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988).

[118] *Vessels*, 408 F.3d at 770.

[119] Defendant's Brief in Support at 13-16.

26

discriminatory reason was more likely what motivated the employer or indirectly showing that the employer's proffered explanation is unworthy of credence."[120]   In this case, Plaintiff attempts to prove pretext by showing that Sheriff Talton's proffered reasons for his termination are not worthy of credence.   To prevail, Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."[121]

Here, although Sheriff Talton now contends that his decision to terminate Plaintiff was based on both the Lucky Cabin incident and past incidents of misconduct, Plaintiff has presented ample evidence contradicting this claim.   There is also evidence of a post hoc attempt by Holt and Talton to bolster the grounds for termination.

Contradictory and inconsistent statements related to the cause of termination are sufficient to support a finding of pretext.[122]   Here, in their depositions, Chief Deputy Rape and Sheriff Talton both provide testimony inconsistent with Talton's proffered reasons for Plaintiff's termination. Rape stated that Plaintiff's Dooly County arrest "was

---

[120] *Daniel v. Dekalb County School Dist.*, --- F. App'x ----, 2014 WL 7271347, at *4 (11th Cir. 2014) (citing *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).

[121] *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks and citation omitted).

[122] *See Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir.1994) ("defendant's contradictory and inconsistent statements . . . were sufficient to show pretext"); *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 889 (11th Cir. 2013) ("Pretext may also be established by proof of inconsistent statements . . . , suggesting that the articulated reasons are recently fabricated or false.").

not a factor" in his decisions.  Talton likewise admitted that he had no problem with that arrest; he even gave Plaintiff a raise shortly after.[123]  Rape and Talton additionally made statements indicating that the allegations of excessive force, argument with Foster, and failure to detect contraband were actually not factors in the termination.[124]

A reasonable fact-finder could also view Sheriff Talton's post hoc identification of past misconduct supporting Plaintiff termination as evidence of pretext.[125]  Neither Rape nor Talton had any knowledge of Plaintiff's prior misuse of his taser until after Holt learned that Plaintiff intended to file an EEOC charge.[126]  It is undisputed that, upon learning of the charge, Holt produced a "Taser file that had not been used in any prior incident or [action]" against Plaintiff.[127]  Sheriff Talton also admitted that he never read Major Holt's recommendation listing the prior incidents of misconduct now identified and stated that he had no knowledge the excessive force allegations when

---

[123] Pl.'s SF ¶ 13;  Pl.'s Resp. to Defs.' SF ¶ 81; Talton Dep. 119-1-5

[124] Pl.'s SF ¶ 184-185; Rape Dep. 91:10-21, 129:20-23.  One other incident involving Plaintiff's use of a Taser on an inmate was raised by Defendants as cause for his termination, though it was not included in Holt's recommendation.  Holt on raised the issue after he learned that Plaintiff planned to file an EEOC charge. Pl.'s SF ¶¶ 34-37, Holt Dep. 166:23-167:7.  Rape said he did not know about the incident, and it was not a factor in his decision either.  Rape Dep. 129:20-23.

[125] "Evidence of a post-hoc attempt to justify an employment decision may be evidence of pretext." *Keaton v. Cobb Cnty.*, 545 F. Supp. 2d 1275, 1303 (N.D. Ga. 2008) aff'd sub nom, No. 08-11220, 2009 WL 212097 (11th Cir. Jan. 30, 2009) (citing *Zarnegar v. St. Paul Fire & Marine Ins. Co.*, No. 93–C–7744, 1995 WL 656675, at *7 n. 5 (N.D. Ill. Nov.6, 1995) ("After-the-fact attempts to provide documentation justifying an employment decision may be evidence of pretext."); *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1496 (11th Cir.1987) (decision to obtain evidence after the fact suggested pretext); *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1177 (10th Cir.2006) ("suspicious timing of ... documentation—after the fact and in anticipation of litigation—reasonably gave rise to an inference of pretext")).

[126] Pl.'s SF ¶¶ 186-187

[127] *Id*.

Plaintiff was terminated. Sheriff Talton further made no mention of poor job performance.  In his deposition, Talton in fact stated that no one ever told him Plaintiff's job performance was unsatisfactory prior to his termination.[128]  Plaintiff always received "fully satisfactory" or "superior" performance reviews.[129]

As to the Lucky Cabin incident, a finding of pretext is supported by the fact that no one at HCSD ever questioned Plaintiff about the incident (or other instances of misconduct alleged) and that Sheriff Talton provided somewhat inconsistent testimony on that issue as well.  Talton testified that, because there are "two sides to every story," he believed "it was important to get [an officer's] side of the story before making any [disciplinary] decision."  There is evidence that he indeed provided a white officer with this opportunity when he was accused of comparable misconduct.[130]  Yet, Sheriff Talton did not make any independent inquiry into the accuracy of any of the allegations against Plaintiff before terminating him.  Nor did he question whether anyone else had spoken to Plaintiff or attempt to speak with Plaintiff himself.

Furthermore, as discussed above, Plaintiff has produced sufficient evidence to support a claim against Sheriff Talton under a cat's paw theory.  On this point, Plaintiff has shown that Holt knowingly accepted the allegations of people he knew were involved in an unlawful gambling enterprise (and even a former HCSD inmate) and

---

[128] Talton's Dep. 58:21-24.
[129] Pl.'s SF ¶ 1
[130] Pl.'s SF ¶ 72-74

29

then recommended Plaintiff's termination without ever speaking to his own officer.[131] Major Holt then gave selective information to his superiors about past incidents of misconduct, though Plaintiff had not been questioned or disciplined as a result of events either.  Holt, however, was quick to question white officers, giving them more favorable treatment when accused of comparable misconduct.[132]  Major Holt's past use of racial slurs and viewing of racist internet websites may also - when combined with Plaintiff's other evidence – be used as evidence of pretext.[133]

The Court thus finds that there are genuine issues of material fact in this case that are better left for a jury to decide.  Defendant's Motion for Summary Judgment is thus **DENIED** with respect to Plaintiff's Title VII claims against Sheriff Talton.

### B.  Talton's Affirmative Defenses of Sovereign and Qualified Immunity

Defendant Sheriff Talton next contends that summary judgment must be granted in his favor with respect to Plaintiff's §§ 1981 and 1983 claims because he is entitled to both qualified and sovereign immunity.

---

[131] Pl.'s SF ¶ 165-167, Holt Dep. 138:20-23, 278:1-13, 280:1-10.

[132] Plaintiff also identified another African-American officer who was treated less favorably than a similarly situated white officer.  This type of "me, too" evidence is generally suspect. *See Bell v. Crowne Mgmt., LLC*, 844 F. Supp. 2d 1222, 1236 (S.D. Ala. 2012).  Such evidence, however, has been found relevant as to pretext and admissible to show intent to discriminate under Rule 404(b) when the situations involve the same decision-maker, s*ee King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1275 (N.D. Ala. 2014) (citing *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261 (11th Cir. 2008)), and the same type of discrimination, *Bell*, 844 F. Supp. 2d at 1236 (citing *Lewis v. Deparment of Transp.*, 187 F. App'x 961, 961–62 (11th Cir. 2006)).  Here, the Court finds sufficient other evidence to raise a genuine issue as to pretext, the Court will thus reserve ruling on the relevance and admissibility of the "me too" evidence in this case.

[133] *Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002).  *See also Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002)

1. <u>Qualified Immunity</u>

When a government official is sued in his individual capacity under either § 1981 or § 1983, he may raise the defense of qualified immunity.  "The doctrine of qualified immunity insulates government agents from personal liability for money damages for actions taken in good faith pursuant to their discretionary authority."[134] When invoked, the government official must prove that he was acting within the scope of his discretionary authority at the time of the challenged conduct.[135]  If he meets this burden, the burden shifts to the plaintiff to prove both a constitutional violation and that the right violated was clearly established at the time of the violation.[136]

In this case, there is no dispute that Sheriff Talton was acting within the scope of his discretionary authority when he terminated Plaintiff.  Defendants likewise do not dispute that "the equal protection right to be free from intentional race discrimination" in the context of wrongful termination has been clearly established.[137]  The only issue therefore is whether Plaintiff has presented sufficient evidence of a constitutional violation.  Because, as stated above, the test and evidentiary burdens for establishing claims of intentional discrimination under the Title VII, § 1981 and § 1983 are the same –

---

[134] *Smith v. State of Alabama*, 996 F. Supp. 1203, 1211 (M.D. Ala. 1998) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Greason v. Kemp*, 891 F.2d 829, 833 (11th Cir.1990)).

[135] *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992).

[136] *See id*

[137] *See Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1272 (11th Cir. 2003) ("[I]it was clearly established in 1999 that it was unlawful for a public official to make a race–or gender-based decision concerning hiring, termination, promotion, or transfer to or from an existing position.").

31

and the Court has found that Talton's liability under Title VII involves questions of fact that must be reserved for a jury – the Court must now also find that Plaintiff has created genuine issues of material fact with respect to his §§ 1981 and 1983 claims as well.

2. <u>Sovereign Immunity</u>

Sheriff Talton also argues that he is entitled to sovereign immunity with respect to the claims brought against him in his "official capacity."  This argument is based on a recent decision of the Eleventh Circuit Court of Appeals which held that a Georgia sheriff enjoyed Eleventh Amendment immunity against his employee's wrongful termination claims when sued in his official capacity.[138]  Plaintiff does not dispute the validity of Defendants' legal argument, but he does contend that such immunity applies only to Plaintiff's claims for damages and not to his claims for prospective injunctive relief, i.e., reinstatement.  Defendants did not put forth any argument to the contrary.[139]

Summary Judgment is thus **GRANTED** in favor of Sheriff Talton with respect to Plaintiff's §§ 1981 and 1983 claims for damages in his official capacity.  Defendants' Motion is **DENIED** as to Plaintiff's claims against Sheriff Talton in his individual capacity and claims for injunctive relief against Talton in his official capacity.

---

[138] *Pellitteri v. Prine*, 776 F.3d 777, 783 (11th Cir. 2015)
[139] *See Alden v. Maine*, 527 U.S. 706, 710 (1999).

<u>CONCLUSION</u>

Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** is part:  The Motion shall be **GRANTED** as to (1) Plaintiff's claims against Houston County and (2) Plaintiff's §§ 1981 and 1983 claims for damages against Sheriff Talton in his official capacity.  As to all other claims, Defendants' Motion is **DENIED.**

**SO ORDERED,** this 29th day of September, 2015.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

33